UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 10-20309 |
| Plaintiff, | Sean F. Cox |
| vs. | United States District Judge |
| ANTHONY ROBERT WILLIAMS, | Michael Hluchaniuk |
| Defendant. | United States Magistrate Judge |

**REPORT AND RECOMMENDATION REGARDING
DEFENDANT'S MOTION TO SUPPRESS (Dkt. 22)**

**I.   PROCEDURAL HISTORY**

An indictment was returned on May 26, 2010, charging defendant Anthony Robert Williams, aided and abetted by another individual, with possession of two firearms on June 11, 2009, following a conviction for a felony offense.  Defendant filed the instant motion to suppress on August 31, 2010.  (Dkt. 22).  The government filed a response to the motion on September 21, 2010.  (Dkt. 26).  An evidentiary hearing was held on November 2, 2010.  After the transcript of the hearing was prepared, the government filed a supplemental brief asking that the motion be denied.  (Dkt. 35).  The defense also filed a supplemental brief on December 16, 2010.  (Dkt. 36).  Government counsel notified the court on December 21, 2010 that the government did not intend to respond to the

defendant's brief.

This matter is now ready for report and recommendation. For the reasons set forth below, the undersigned **RECOMMENDS** that defendant's motion to suppress be **GRANTED**.

## II.  RELEVANT FACTS

On June 11, 2009, law enforcement officers associated with a Project Safe Neighborhoods task force were conducting an operation in the north side of Flint. The focus of the operation on that occasion was a residence on Woodhall Street, which had been the site of criminal activity engaged in by one of the street gangs then existing in that area of Flint. (11/2/2010 Hrg. Tr., p. 9).  One of the officers involved in that operation was Scott Watson, who maintained a stationary surveillance of the residence on Woodhall.  While watching that area, Watson observed a gray Impala that he believed had been involved in prior criminal activity. (Tr., p. 13).  On one occasion, the gray Impala left the area about the same time a blue Cadillac left the area and both vehicles returned about the same time. (Tr., pp. 14-15).  Watson concluded that the two vehicles had some connection because they left and returned at about the same time.  He did not observe any contact between the occupants of the vehicles and did not know who those occupants were. (Tr., p. 15).  As part of the operation, Watson informed other task force officers of the description of these two vehicles for the purpose of allowing

the other officers to monitor the vehicles. *Id*.

The blue Cadillac returned to the Woodhall Street area without the Impala and then left again. (Tr., pp. 17-18). Sometime later, the Impala was spotted by other officers including Scott Wright and Felix Trevino. The Impala was seen in the parking lot of a party/liquor store and Wright observed what he thought was a drug deal between the driver of the Impala and another individual. (Tr., p. 39). The Impala left the party store and Wright radioed other officers informing them of the circumstances and indicating he wanted to have the vehicle stopped and the occupants questioned. Michigan State Trooper Charles Barker, who was also working with the task force and, on that occasion, driving a marked patrol car, saw the Impala and pulled in behind it when the Impala stopped in a driveway on Dartmouth Street. (Tr., p. 78). Tpr. Barker approached the driver of the Impala, who had already gotten out of the car, and asked him if he had been at the party store and if he had a license. The driver acknowledged being at the party store and stated he did not have a license. Tpr. Barker then placed him under arrest and put him in the back seat of his police vehicle. (Tr., p. 79). A small quantity of marijuana was found on the driver's person and outside the passenger side of the Impala. After being arrested the driver of the Impala asked Tpr. Barker if he could speak with an undercover officer. (Tr., p. 80).

Wright and Trevino came to the area on Dartmouth Street where the Impala

was and the driver spoke to Wright from the back seat of the police car. Wright did not learn the driver's name and had no prior relationship with him. (Tr., p. 41). The driver was concerned about having his vehicle impounded and, in an apparent attempt to avoid that, he informed Wright that he knew of someone, identified only as a "black male," driving a blue Cadillac, who had just left Woodhall and had a handgun for sale. The driver further described the Cadillac as being in "rough condition" and also provided the caliber of the handgun that was for sale. No further information was provided by the driver of the Impala. (Tr., p. 42).

Wright and Trevino left the area of Dartmouth Street and began to look for the blue Cadillac. The officers eventually observed a blue Cadillac at a gas station at the intersection of Fleming and Pierson Streets. (Tr., p. 43). The officers observed an individual leave the gas station building and get into the driver's seat of the Cadillac. (Tr., p. 44). Based on the appearance of this blue Cadillac, which generally matched the description of the blue Cadillac identified by the driver of the Impala (blue Cadillac in "rough condition") several police vehicles boxed the Cadillac in as it attempted to drive away from the gas station. (Tr., p. 47). Wright approached the driver's side of the vehicle and Trevino approached the passenger side. Trevino observed an assault rifle laying across the lap of the passenger and after that person was "secured" and removed from the vehicle a handgun that was observed between the front seats. (Tr., pp. 69-70). These two firearms are the

basis of the present prosecution.

### III. ARGUMENTS OF THE PARTIES

The government has the burden to establish the propriety of this warrantless search. The government contends that the officers who stopped the blue Cadillac had "reasonable suspicion" that the occupants were "involved in or about to be engaged in criminal activity" and, therefore, the officers acted properly in stopping and attempting to question the occupants of the blue Cadillac. The facts the government refers to in support of its position include: (1) the blue Cadillac was observed leaving an area known for criminal activity; (2) the blue Cadillac was "associated with" a second vehicle, a gray or silver Impala, and the officers believed the second vehicle had been involved in "shootings and robberies," at some undetermined time in the past, committed by individuals who resided in or frequented the Woodhall Street area; (3) the driver of this second vehicle was believed to have been involved in a drug transaction shortly after being in the Woodhall Street area; (4) the driver of the second vehicle was found in possession of marijuana; (5) the driver of the second vehicle gave officers information regarding "criminal activity involving the occupants of" a blue Cadillac; and (6) the driver of the second vehicle "admitted that he and the Cadillac were on Woodhall just prior to being questioned by the officers."

The government relies on, among other cases, *United States v. Carter*, 413

F.3d 712 (8th Cir. 2005), *United States v. Miller*, 314 F.3d 265 (6th Cir. 2002), and *United States v. Pelham*, 801 F.2d 875 (6th Cir. 1986), to support its argument that "first hand information from an individual involved in criminal activity is reliable."

Defendant challenges the government's contention that reasonable suspicion for the stop of defendant's vehicle existed. Defendant argues that the statements of the driver of the second vehicle, a gray or silver Impala, were not established as being reliable because there was insufficient corroborative information and the individual did not have a history of providing accurate, reliable information. Defendant cites *Florida v. J.L.*, 529 U.S. 266 (2000), *Adams v. Williams*, 407 U.S. 143 (1972), and *United States v. Patterson*, 340 F.3d 386 (6th Cir. 2003) in support of his position.

## IV. ANALYSIS AND CONCLUSIONS

Police officers are permitted to make brief investigatory stops of vehicles where they have a "reasonable, articulable suspicion that the person [in the vehicle] has been, is, or is about to be engaged in criminal activity." *United States v. Hensley*, 469 U.S. 221, 227 (1985); *United States v. Cortez*, 449 U.S. 411, 417 (1981). This type of action by a police officer has come to be referred to as a *Terry* stop based on the Supreme Court opinion in *Terry v. Ohio*, 392 U.S. 1 (1968). The "level of suspicion required for a Terry stop is ... less demanding than that for probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1990). Whether an

officer had a reasonable suspicion justifying a *Terry* stop depends on the totality of the circumstances surrounding the stop. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

In the present case, law enforcement officers were informed that the driver of a blue Cadillac, that "just came off Woodhall," had a handgun and the gun was for sale." (Tr., p. 42). While the parties did not address this issue, there exists a question as to whether, even if the information was reliable, "criminal activity" was actually alleged. Superficially, a person possessing a handgun and the handgun being for sale is not a crime under all circumstances. Given the increased instances in Michigan of individuals being given permits to carry concealed weapons one cannot conclude that carrying a handgun in a car is likely to be against the law. Clearly, if the firearm was possessed by a prohibited person (e.g., a felon), if the firearm were possessed in conjunction with the commission of another crime, or if the firearm were being illegally carried in the vehicle, criminal activity would have been alleged. However, such information was not alleged and it is not clear that such information can be inferred from the circumstances of this case. In *Florda v. J.L.*, 529 U.S. 266, 273 n* (2000), the Court suggested that certain aspects of "criminal activity" might be inferred but did not fully describe the limits of that inference. The government did not assert exactly what criminal activity was suspected in these circumstances, although they were not challenged

by the defendant on that point and may not have felt the need to address that apparently uncontested issue.

In *Adams v. Williams*, 407 U.S. 143 (1972) the Court addressed a situation where an informant approached a police officer, late at night in a high-crime area, and told the officer the driver of a near-by vehicle was "carrying narcotics and had a gun at his waist." *Id*. at 145. The informant was known to the officer and had provided information to the officer in the past. *Id*. at 146. In deciding that the information provided by the known and historically reliable informant, who might have been subject to criminal penalties if the information proved false, was sufficient to establish reasonable suspicion, the Court stated:

> Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. But in some situations - for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime - the subtleties of the hearsay rule should not thwart an appropriate response.

*Id*. at 147.

"Informants' tips doubtless come in many shapes and sizes from many different types of persons." *Illinois v. Gates*, 462 U.S. 213, 232-33 (1983). The weight of an informant's tip is dependent on "the informant's 'veracity' or 'reliability' and his 'basis of knowledge' [and under the totality of circumstances

analysis] a deficiency in one [factor] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id*. Reliability of an informant's tip can be established in a number of ways including: (1) corroboration of significant parts of the informant's statement; (2) a history on the part of the informant of providing reliable information; (3) a detailed description of what the informant had seen firsthand; (4) a willingness of the informant to be named; and (5) a statement against the informant's penal interest. *United States v Jessie*, 2006 WL 938983 (W.D. Ky. 2006).

The government contends that the information from the driver of the Impala provided a basis for concluding there was reasonable suspicion of criminal activity. The government contends that "[first hand information from an individual involved in criminal activity is reliable" citing *United States v. Miller*, 314 F.3d 265 (6th Cir. 2002), *United States v. Pelham*, 801 F.2d 875 (6th Cir. 1986) and *United States v. Carter*, 413 F.3d 712 (8th Cir. 2005). All three of these cases differ in one major respect from the case at hand. Here, the statement from the driver of the Impala was that the driver of a blue Cadillac had a handgun for sale. This information is not an express statement that the driver of the Impala had seen the gun in the blue Cadillac and there is nothing about the statement that would necessarily cause someone to infer that the driver of the Impala had seen the

handgun, firsthand, in the blue Cadillac.[1]  The informants in *Miller*, *Pelham*, and *Carter* clearly stated they personally observed the criminal activity they described, firsthand.  It was also of some significance in these three cases that the informants were not anonymous tipsters and were willing to be identified in the affidavits for the search warrants in question.  Being identified in a search warrant *and* having firsthand information appears to be a combination of factors that could have a level of reliability sufficient for probable cause or reasonable suspicion.  It is not clear if merely being identified, or identifiable, as opposed to being an anonymous tipster, means anything in the absence of firsthand information as was the situation in the three cases noted above.  No authority has been identified that stands for the proposition that if a person, who could be identified, makes allegations of criminal activity without apparent personal knowledge of such activity, that reasonable suspicion is established without more.  The informant from the Impala was not a historically reliable source of information,  a victim of a crime or an "unquestionably honest citizen" and, therefore, further indicia of reliability is needed. *Feathers v. Donahue*, 319 F.3d 843, 849-50 (6th Cir. 2003).

    The government argues that individuals "involved in criminal activity" are

---

[1] "Firsthand" information relates to the basis of knowledge of the informant. That is, if the informant personally observed something, as opposed to being told of the events by someone else, the informant can be said to have firsthand information about the events described.

reliable. Presumably the "criminal activity" the driver of the Impala was involved in was the distribution of marijuana. While there is precedent for the proposition that statements against penal interest can be viewed as being reliable, the mere fact that the driver of the Impala sold marijuana did not enhance his reliability.[2] Nothing the driver said related to his own criminal culpability (there was no evidence he made any admissions about the marijuana found after his vehicle was stopped) and his description of the handgun in the blue Cadillac had no apparent criminal implications for him, so those statements could not be considered as against his penal interest.

The statements of the driver of the Impala could perhaps be viewed as reliable if they were either corroborated in significant ways or if the statements were detailed. Corroboration generally relates to predictive information, that is, information that predicts what a person will do in the future.[3] Where significant

---

[2] If anything, the informant's involvement in other criminal activity and the motive of the informant to mitigate the consequences of that other criminal activity would have a negative effect on the reliability of the informant. Here the informant did not want his vehicle impounded by the police so he wanted to provide information to avoid that consequence. (Tr., p. 42). "'[T]ips made to curry favor with the police ' make an informant's declaration less reliable.'" *United States v. Rodgers*, 2009 WL 3498799 (W.D. Mich. 2009), quoting, *United States v. Kolodziej*, 712 F.2d 975, 978 (5th Cir. 1983).

[3] Here, the informant stated that the blue Cadillac had just come from the Woodhall area and a police officer had been conducting surveillance in that area and had seen a blue Cadillac there. However, information that just tends to identify a determinate person without being predictive of future criminal activity is

predictions of a tipster are verified the information can be viewed as being reliable because "'there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.'" *United States v. Graham*, 483 F.3d 431, 439 (6th Cir. 2007), quoting, *Alabama v. White*, 496 U.S. at 332. The driver of the Impala gave no predictive information regarding the blue Cadillac of the nature given in *Alabama v White*, such as where the vehicle was going, when it would be at a particular place, etc. Further, the information from the driver of the Impala included very little in the way of details of the described wrongdoing. He said the handgun was in a blue Cadillac, which was in rough condition, he apparently gave the caliber of the handgun, and he described the driver of the Cadillac as being a black male. Not included in the statement was the name of the driver of the Cadillac, a specific description of the driver, a description of the handgun (e.g., silver, dark, type of grips, etc.), a description of

---

not significant in the reasonable suspicion analysis. In *Srisavath v. City of Brentwood*, 2007 WL 1805773 (6th Cir. 2007), information that a number of teenagers in baggy pants were looking into parked cars did not establish reasonable suspicion. *Srisavath* relied on *United States v. Patterson*, 340 F.3d 368 (6th Cir. 2003) for its holding that, where information from an anonymous tipster that a group of men on a particular street corner were selling drugs, did not amount to reasonable suspicion. Additionally, the government contends there was an "association" between the Impala and the Cadillac because they had been seen at the same time in the Woodhall area. It is not clear that this information corroborates anything the driver of the Impala said because no information provided by the driver of the Impala identified any "association" between the occupants of the two vehicles.

where the gun was located in the car, or anything else of a specific nature.

In some instances, a furtive gesture can, in conjunction with limited information about criminal activity, result in reasonable suspicion of criminal activity being established. In *United States v. Caruthers*, 458 F.3d 459, 465 (6th Cir. 2006), police received a tip that a man, wearing a red shirt and shorts, was arguing with a female and had fired a gun and then put the gun in his pocket. When the officers approached the area they observed a man matching the description. The man ran when he saw the police. The court said the information provided in the tip did not amount to reasonable suspicion but when combined with the "objectively furtive conduct" reasonable suspicion was established. Similarly, in *Graham, supra*, the police received a tip regarding a man at a specific location that was planing to shot someone at that location. Police went there and observed the man act as if he was hiding something under the seat of the car. The court found that the information did not itself establish a reasonable suspicion, but the furtive gesture undertaken by the defendant as the police approached caused the totality of the circumstances to cross the reasonable suspicion threshold. No evidence of a furtive gesture by anyone in the blue Cadillac, as the police approached, was offered during the hearing.

The government notes that the blue Cadillac had been in an area known for criminal activity prior to being stopped by the police. While contextual

considerations, like time-of-day or high-crime area, have some relevance to the reasonable suspicion equation they are not sufficient in and of themselves. *United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009) ("context-based factors that would have pertained to anyone in the [high-crime area] at that time ... should not be given undue weight").

Additionally, having been in a high-crime area in the recent past, as opposed to being in one at the time of the stop, is too much of a stretch to have significant influence on the reasonable suspicion question. Suspicious activity *in* a high-crime area may mean something, but once the same person or vehicle is outside the high-crime area the significance of that factor dissipates. Care must be taken in placing too much emphasis on factors like high-crime areas for fear of branding everyone who goes there as being involved in criminal activity. *Caruthers*, 458 F.3d at 467.

Defendant argues that the present circumstances are, as a matter of principle, similar to those in *Florida v J.L., supra*. In that case, an anonymous tipster advised the police that a young black male, wearing a plaid shirt, was at a particular bus stop and was carrying a gun. The police went to that bus stop, found a young black male with a plaid shirt and eventually found a handgun on his person. In ruling that the information provided by the tipster did not amount to reasonable suspicion of criminal activity justifying a *Terry* stop the Court said the information, although

accurate in its identification and location of a young black male in a plaid shirt, did not "show that the tipster [had] knowledge of concealed criminal activity [because to establish reasonable suspicion] a tip [must be] reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *J.L.* at 272. The only information that the police had in *J.L.* was from " an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about" the defendant. *Id.* at 271. Our informant here was not known to the police, may not have been accountable for providing false information (no evidence presented at the hearing suggested the informant was at risk if he provided false information) and his reliability was suspect due to his motive to curry favor with the police. It is not possible to find that the informant in *J.L.* was in a different situation than the driver of the Impala with respect to reliability. Like the informant in *J.L.*, the police could only corroborate general information that had a "tendency to identify a determinate person" (black male, blue Cadillac, had been on Woodhall) and not information that was reliable in its assertion of illegality. Defendant's argument that this case is so much like *J.L.* that the conclusion here should be the same is persuasive.

Although the government does not make an argument that, given the level of violence in our communities, where firearms are involved, the standards for

measuring reasonable suspicion should be reduced, one could easily imagine that such an argument could be made. As appealing as it might be to lower the standards when firearms are alleged to be improperly possessed, the Supreme Count has considered and rejected that argument. "Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. ... But an automatic firearm exception to our established reliability analysis would rove too far. Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing" a phone call. *J.L.* at 272-73.

Following controlling precedent, as we must, the undersigned recommends that defendant's motion to suppress be granted. While, given the above recommendation, it is not necessary to address the question of whether the conduct of the police officers, following the stop of the vehicle, was proper, the undersigned would find that, if the initial stop of the vehicle had been valid, the officers were justified in ordering the occupants of the Cadillac out of the vehicle based on the observation of the assault rifle across the lap of the passenger as they approached the vehicle.

## V.  RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendant's motion to suppress be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

|  |  |
|---|---|
| Date:  January 24, 2011 | s/Michael Hluchaniuk<br>Michael Hluchaniuk<br>United States Magistrate Judge |

## CERTIFICATE OF SERVICE

I certify that on January 24, 2011, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: Nancy A. Abraham, AUSA, and Kenneth R. Sasse, and that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): Pretrial Services Agency and United States Marshal Service.

s/Tammy Hallwood<br>
Case Manager<br>
(810) 341-7887<br>
tammy_hallwood@mied.uscourts.gov